IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

MYRON W. BURR and ANNE E. PROUTY,  )
                                    )
                 Plaintiffs,        )   TC-MD 130126N
                                    )
        v.                          )
                                    )
MULTNOMAH COUNTY ASSESSOR,          )
                                    )
                 Defendant.         )   **DECISION**

Plaintiffs filed their Complaint challenging the real market value of property identified as

Account R632294 for the 2012-13 tax year. A trial was held by telephone on July 15, 2013.

Myron W. Burr (Burr) appeared and testified on behalf of Plaintiffs. Jeff Brown (Brown),

Residential Appeals Lead Appraiser, appeared on behalf of Defendant. Michael Watson

(Watson), Registered Appraiser 2, testified on behalf of Defendant. Plaintiffs' Exhibits 1, 3, 4, 5,

7 and 8 were received without objection. Defendant objected to, and the court excluded,

Plaintiffs' Exhibits 2 and 6, both letters from real estate brokers who were unavailable to testify

at trial. Defendant's Exhibits A through E were received without objection.

## I. STATEMENT OF FACTS

Plaintiffs described the subject property as "a detached condo in the Macleay Overlook

neighborhood." (Ptfs' Mem at 2, Jul 2, 2013.) Plaintiffs reported that the subject property is

2,176 square feet. (Ptfs' Ex 1.) The subject property was built in 2009 and purchased by

Plaintiffs for $599,000 on September 30, 2009. (Ptfs' Ex 8a.) Burr testified that the subject

property is unique; according to Burr, "[d]etached condos are rare in Multnomah County * * *."

(Ptfs' Mem at 2.) Watson testified that he is aware of two other "detached condo" developments

in Multnomah County, but he did not research properties in those other developments.

Burr testified that the subject property is one of the smallest homes in its "detached condo development." He testified that the subject property yard is located in a two-foot perimeter around the house; the remaining yard and landscaping is owned in common. Burr testified that four of the eight properties in the subject property's development sold in 2011 and 2012. (Ptfs' Mem at 2; Ptfs' Ex 1.) He testified that those sales have similar views as the subject property and have similar interior and exterior amenities as the subject property. (*See id.*) Burr testified that three of the four sales were bank-owned at the time of sale; the property located at 3227 NW Skyline Blvd (sale 3) was the only one of the four sales that was not bank-owned at the time of sale. He testified that not all bank-owned sales are distressed sales. Burr testified that he did not consider the three bank-owned sales in the subject property development to be distressed sales, noting that the sales were on the market for 161, 474, and 480 days. (*See id.*) The three bank-owned sales identified by Burr sold for $440,000, $459,000, and $475,000, respectively. (Ptfs' Ex 1.) Burr determined that those sales indicated prices per square foot of $158.96, $193.34, and $171.60, respectively. (*Id.*)

Burr testified that sale 3 had a superior finish as compared with the subject property, so he made a downward adjustment of $150,000 to the sale price.[1] Burr testified that his sale 3 sold for $568,900 on July 16, 2012, after eight days on the market. (*See* Ptf's Ex 1.) He testified that it was not bank-owned at the time of sale. Burr determined an adjusted price per square foot of $176.45 for sale 3. (*Id.*) He testified that, based on those four sales in the subject property's neighborhood, he determined a price of $175.09 per square foot for the subject property,

///

_____

[1] Burr's sale 3 is described as an "Exceptionally Upgraded Home w/Custom Features, Quality & outstanding Views never found at this price. Spectacular property built for owner boasts Vaulted Wood ceilings, extensive use of Hardwood, Slab Granite, Stone, Upgraded Appls, Built ins. & Luxurious Master Suite." (Ptfs' Ex 3 at 1.)

indicating a value of $380,997. (*See id.*) Burr subtracted $4,000 from that value because the subject property does not have central air conditioning, for a value of $376,997. (*Id.*)

In support of his use of bank-owned sales, Burr provided excerpts from the Appraisal Institute's Guide Notes to the Standards of Professional Appraisal Practice of the Appraisal Institute, dated May 3, 2013. (Ptfs' Ex 4 at 1.) He drew the court's attention to the statement that "[a]ppraisers cannot categorically discount foreclosures and short sales as potential comps in the sales comparison approach[,]" and that "[a] sale of a bank-owned property might have involved typical motivations, so the fact that it was a foreclosed property would not render it ineligible as a comp." (Ptfs' Ex 5.)

Burt testified that he also completed a time-adjusted analysis of the four sales in the subject property's neighborhood. (Ptfs' Ex 1.) He explained:

> "[t]o approximate [real market value] on January 1, 2012, the sales price per square foot of the three comparable homes that sold in May-July of 2012 were averaged to get a value [of] $169.01 * * *. Then a line was drawn on a plot of the sales price per square foot from this value to the value for the home sold in May 2011 ($193.34). The [real market value] on January 1, 2012, was then estimated by linear interpolation between these two sales data points."

(Ptfs' Mem at 3.) Based on that analysis, he determined an indicated value of $388,200 for the subject property as of January 1, 2012. (*Id.*) Based on his two analyses, Burr requests a 2012-13 real market value of $382,598 for the subject property. (*Id.* at 7.)

Watson testified that Burr's analysis under the sales comparison approach is incomplete because he failed to adjust his comparable sales for time and for the fact that they were bank-owned at the time of sale. He testified that three of Burr's comparable sales should be adjusted upward because they were "distressed" sales. Watson testified that, in his opinion, Burr's sale 3 should be adjusted downward by $50,000, not $150,000, for an adjusted sale price of $518,900.

///

He testified that Burr's "time trend analysis" is insufficient because it included only four data points.

Watson testified that he completed two studies of sales in the "Skyline/Forest Heights Market Area," one for September 2010 to May 2011 and one for September 2011 to May 2012. (*See* Def's Ex A at 1-3.) He separated sales into distressed and non-distressed sales. (*Id.*) Watson's 2011 study included 17 distressed sales with sale prices ranging from $220,000 to $1,000,000, with a median price of $425,000, and 98 non-distressed sales with sale prices ranging from $191,500 to $1,850,000, with a median of $470,000. (*Id.* at 2.) Watson's 2012 study included 34 distressed sales with sale prices ranging from $127,500 to $1,299,000, with a median price of $310,500, and 93 non-distressed sales with sale prices ranging from $198,000 to $1,075,000, with a median of $470,000. (*Id.* at 3.) Watson testified that he found a difference of 33.9 percent between the median sale prices of distressed and non-distressed sales from September 2011 to May 2012. (*See id.*)

Watson testified that a bank-owned, distressed, sale may sell for less than a non-distressed sale for a variety of reasons. He testified that, in a typical sale, the buyer receives a warranty deed, which guarantees no cloud on the title; by contrast, in a bank sale the buyer receives a bargain and sale deed, which includes no guarantee of title. Watson testified that many bank-owned sales are "winterized" and prospective buyers have no opportunity to inspect the property prior to purchase. He testified that many bank-sales are sold "as-is." Watson testified that banks often require potential buyers to complete loan prequalification prior to sale. He testified that Plaintiffs' three bank-owned sales all sold via bargain and sale deeds.

/ / /

/ / /

Watson reported that Plaintiffs purchased the subject property in September 2009 for $599,000. (Def's Ex D at 1.) He testified that he time-adjusted the subject property purchase price in September 2009 to January 1, 2012, for an adjusted price of $575,914. (*Id.*)

The 2012-13 tax roll real market value of the subject property was $462,310. (Ptfs' Compl at 2.) The 2012-13 maximum assessed value of the subject property was $336,400. (*Id.*) Plaintiffs request a 2012-13 real market value of $382,598. (*Id.* at 1.) Defendant requests that the 2012-13 real market value be sustained. Brown confirmed at trial that a reduction in the 2012-13 real market value requested by Plaintiffs would result in tax savings to Plaintiffs.

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2012-13 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor* (*Richardson*), TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citations omitted). Real market value is defined in ORS 308.205(1), which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."[2]

The assessment date for the 2012-13 tax year was January 1, 2012. ORS 308.007; ORS 308.210.

The real market value of property "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *." ORS 308.205(2). The three approaches of value that must be considered are: (1) the cost approach; (2) the sales comparison approach; and (3) the income approach. OAR 150-308.205-(A)(2)(a). Although all

///

---

[2] All references to the Oregon Revised Statutes (ORS) are to 2011.

three approaches must be considered, all three approaches may not be applicable in a given case. *Id.*

Plaintiffs have the burden of proof and must establish their case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Rev.*, 4 OTR 302, 312 (1971). "[I]t is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.,* 18 OTR 324, 332 (2005) (citing *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002)). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof * * *." *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

Burr relied on sales in the same "detached condo development" as the subject property to support Plaintiffs' requested real market value of $382,598 for the 2012-13 tax year. The sales comparison approach "may be used to value improved properties, vacant land, or land being considered as though vacant." *Chambers Mgmt. Corp. v. Lane County Assessor,* TC-MD No 060354D, WL 1068455 at *3 (Apr 3, 2007) (citations omitted). "The court looks for arm's length sale transactions of property similar in size, quality, age and location" to the subject property. *Richardson,* WL 21263620 *3. OAR 150-308.205-(A)(2)(c) states:

> "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions. When nontypical market conditions of sale are involved in a transaction (duress, death, foreclosures, interrelated corporations or persons, etc.) the transaction will not be used in the sales comparison approach unless market-based adjustments can be made for the nontypical market condition."

The unadjusted prices of Burr's four sales ranged from $440,000 to $568,900. Defendant took issue with Burr's sales because three of the four sales were bank-owned at the time of sale. OAR 150-308.205-(A)(2)(c) states that, if "nontypical market conditions of sale are involved in a transaction" then "the transaction will not be used in the sales comparison approach unless market-based adjustments can be made for the nontypical market condition." Defendant determined that bank-owned sales were not typical of the market as of January 1, 2012, suggesting that bank-owned sales may not be used in a sales comparison approach unless "market-based adjustments can be made."

Burr disagreed with Defendant that bank-owned sales were non-typical of market conditions as of January 1, 2012, noting that three sales in the subject property development in 2011 and 2012 were bank-owned sales. "[W]here the majority of the sales are distress, it would seem that that kind of sale would provide a more accurate reflection of the market." *Morrow County Grain Growers v. Dept. of Rev.*, 10 OTR 146, 148 (1985). Thus, it may be that the subject property's market was characterized by distress sales as of January 1, 2012. Even if the court agrees with Burr that bank-owned sales were typical for the subject property's market as of January 1, 2012, Burr's sales comparison approach is incomplete and does not support Plaintiffs' requested real market value. Under OAR 150-308.205-(A)(2)(c), adjustments are required for differences between the subject property and comparable sales. Burr made no adjustments to his four sales, other than a $150,000 downward adjustment to sale 3. He provided no evidence in support of his $150,000 adjustment to sale 3. Burr's comparable sales evidence does not meet the requirements of OAR 150-308.205-(A)(2)(c). The court notes that the 2012-13 tax roll real market value of the subject property, $462,310, is within the range of unadjusted sale prices

/ / /

identified by Burr. On the evidence presented, the court finds no support for Plaintiffs' requested reduction in the 2012-13 real market value of the subject property.

Even though Plaintiffs failed to meet their burden of proof, the court has jurisdiction to determine the real market value of the subject property based on the evidence presented. ORS 305.412. Defendant requests that the 2012-13 real market value of the subject property be sustained. The only evidence presented by Defendant of the subject property's 2012-13 real market value was the time-adjusted price of the subject property based on its September 2009 purchase price of $599,000. The 2009 purchase price for the subject property is not helpful to a determination of its real market value as of January 1, 2012. Defendant's remaining evidence was two studies of sales in the "Skyline/Forest Heights Market Area." Those studies each included in excess of 100 sales with prices ranging from $127,500 to $1,850,000. The court is unable to determine the 2012-13 real market value of the subject property based on those studies.

### III. CONCLUSION

After careful consideration, the court finds that Plaintiffs failed to meet their burden of proof. The evidence presented by Plaintiffs does not support their requested reduction in the 2012-13 real market value of the subject property. The court found the evidence presented by

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Defendant to be inconclusive. The court was unable to determine the 2012-13 real market value of the subject property. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is denied.

Dated this ____ day of August 2013.

_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This Decision was signed by Magistrate Allison R. Boomer on August 19, 2013. The court filed and entered this Decision on August 19, 2013.*